MICHAEL T. LEMPRES (SBN 120823)
*mike.lempres@coinbase.com*
JUAN A. SUAREZ (SBN 268859)
*juan@coinbase.com*
**COINBASE, INC.**
548 Market Street, #23008
San Francisco, CA 94104
Tel.: 415.275.2890

STEVEN A. ELLIS (SBN 171742)
*sellis@goodwinlaw.com*
SHAUNA E. WOODS (SBN 300339)
*swoods@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Floor
Los Angeles, CA  90017
Tel.: 213.426.2500
Fax.: 213.623.1673

GRANT P. FONDO (SBN 181530)
*gfondo@goodwinlaw.com*
**GOODWIN PROCTER LLP**
135 Commonwealth Drive
Menlo Park, CA  94025-1105
Tel.: 650.752.3100
Fax.: 650.853.1038

Attorneys for Respondent: COINBASE, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:17-cv-01431-JSC |
| Petitioner, | |
| v. | **RESPONDENT COINBASE, INC.'S OPPOSITION TO PETITION TO ENFORCE INTERNAL REVENUE SERVICE SUMMONS** |
| COINBASE, INC., | |
| Respondent. | Courtroom:   F (15th Floor) |
| | Judge:         Hon. Jacqueline Scott Corley |

*Goodwin Procter LLP*
*601 S Figueroa Street, 41st Floor*
*Los Angeles, CA  90017*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................1

BACKGROUND AND PROCEDURAL HISTORY ....................................................2

    A.    Two Government Reports Criticize The IRS's Inaction On Digital Currency .........2

    B.    Rather Than Address Its Policy Failings, The IRS Applies *Ex Parte* For An Order Permitting Service Of A Massive John Doe Summons on Coinbase ..............4

    C.    The IRS Brings This Enforcement Action ................................................4

    D.    The Court Sets A Briefing Schedule ........................................................5

    E.    Members of Congress Criticize The IRS For Its Broad Summons To Coinbase ........................................................................................6

    F.    The Court Holds A Hearing On The Intervention Motion ........................6

    G.    IRS Files Notice of Narrowing of Summons ........................................7

    H.    Court Grants Intervention Motion ........................................................8

ARGUMENT ................................................................................................................8

I.    As A Threshold Matter, The IRS Has Not Demonstrated That It Is Acting To Further A Proper Enforcement Purpose. ....................................................10

II.    The IRS Has Not Shown That The Modified Summons, Which Requests More Than 8.9 Million Transaction Records And Other Information From 14,355 Accounts, Seeks Information That Is Relevant To The IRS's Purpose ..............15

    A.    The Modified Summons Is Substantially Overbroad. ............................15

    B.    The IRS Has Only An "Idle Hope," And Not A "Realistic Expectation" That The Information Sought Will Promote Proper Enforcement Purposes. ..........21

    C.    The Narrowing Of The Summons, Although Welcome, Does Not Cure The Summons Of Its Overbreadth ................................................................22

III.    The Petition Should Be Denied Because Enforcement Of The Summons Would Be An Abuse Of The Court's Process ....................................................24

IV.    Coinbase Requests An Evidentiary Hearing ........................................24

CONCLUSION ............................................................................................................25

Godwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*David H. Tedder & Assocs. v. U.S.*,
77 F.3d 1166 (9th Cir. 1996)...........................................................................15, 22

*Matter of Oil and Gas Producers Having Processing Agreements with Kerr-McGee Corp.*,
500 F. Supp. 440 (W.D. Okla. 1980) ................................................................24

*In re Tax Liabilities of John Does (Agricultural Asset Mgmt Co.)*,
688 F.2d 144 (2d Cir. 1982)..............................................................................17

*In re Tax Liabilities of John Does (Mastercard Payment Cards)*,
2002 WL 32881074 (S.D. Fla. Oct. 31, 2002) ................................................17

*U.S. v. Arthur Young & Co.*,
465 U.S. 805 (1984) ..........................................................................................15

*United States v. Bisceglia*,
420 U.S. 141 (1975) .................................................................................. *passim*

*United States v. Church of Scientology*,
520 F.2d 818 (9th Cir. 1975).........................................................................9, 24

*United States v. Donovan*,
429 U.S. 413 (1977) ..........................................................................................10

*United States v. Goldman*,
637 F.2d 664 (9th Cir. 1980)...........................................................10, 15, 21, 22

*United States v. Humble Oil & Refining Co.*,
488 F.2d 953 (5th Cir. 1974) ............................................................................11

*United States v. Kis*,
658 F.2d 526 (7th Cir. 1981) ............................................................................24

*United States v. LaSalle Nat'l Bank*,
437 U.S. 298 (1978) .......................................................................................9, 24

*United States v. Microsoft Corp.*,
No. 2:15-CV-00102-RSM, 2015 WL 4496749 (W.D. Wash. June 17, 2015) .........................24

*United States v. Mutschler & Assocs.*,
734 F.2d 363 (8th Cir. 1984).............................................................................17

*United States v. Powell*,
379 U.S. 48 (1964) ........................................................................................9, 22, 24

*United States v. Samuels, Kramer & Co.*,
712 F.2d 1342 (9th Cir. 1983).................................................................9, 10, 17, 24

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

*United States v. Sidley Austin Brown & Wood*,
   2004 WL 816448 (N.D. Ill. Apr. 15, 2004) ...............................................................16

**Federal Statutes**

26 U.S.C. § 7602 ...............................................................................10, 12, 15, 22

26 U.S.C. § 7604 ...........................................................................................8

26 U.S.C. § 7609 ...........................................................................................4

This is not a case about the Government investigating tax evasion, nor has it ever been. Indeed, if the IRS were genuinely interested in ensuring that taxpayers paid taxes on their bitcoin, the IRS would have provided additional guidance for taxpayers and worked with the industry to develop a useful and effective third-party reporting regime. Instead, the IRS, under pressure from critics in Congress, the General Accounting Office, and the Treasury Department, all of whom have called on the IRS to develop better policies, rules, data, and procedures with regard to digital currency tax reporting, decided to issue a John Doe summons to Coinbase in an attempt to show the critics that the IRS was taking "tough" action rather than continuing to ignore the issue.

The initial summons in this matter was extraordinarily overbroad, seeking the transaction records (and just about every other piece of information, including security settings) for every Coinbase account that was active in the 2013-15 period. That would have included the private financial records of approximately 500,000 account holders. After Coinbase refused to buckle to the Government's overreach and the Court questioned the breadth of the original summons, the IRS announced that it would narrow its summons. Even as modified, however, the summons still seeks more than 8.9 million transaction records and a huge amount of information pertaining to more than 14,000 taxpayers, based on the thinnest reed of evidence. Buying, selling, or transferring bitcoin or other digital currency is not in any way illegal or suspicious activity, and yet the IRS seeks to treat any dealing in digital currency as evidence of tax avoidance.

The Government's enforcement petition should be denied because the IRS has not met its burden of showing (1) that the summons will further a proper enforcement purpose and (2) that the information sought is relevant to such a proper purpose. Instead, as is clear from the record, the IRS is engaging in a massive fishing expedition, hoping to find some evidence of tax avoidance so that the IRS may quiet its critics in Washington, D.C. and justify this misguided adventure.

Coinbase opposes the enforcement petition to protect its customers and out of unfortunate necessity. Coinbase did not seek out this dispute, but, having been brought into it, finds itself in a position in which it is forced to litigate. Coinbase is a local, San Francisco-based, industry-leading financial services company that offers a range of services that allow account holders

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

1   (individuals and businesses) to conduct transactions using digital currencies, including bitcoin.

2   Coinbase is registered as a money services business with the United States Department of the

3   Treasury and the Financial Crimes Enforcement Network (known as "FinCEN"), and it is licensed

4   in 36 states (plus the District of Columbia and Puerto Rico). Coinbase, which is not itself under

5   investigation or suspected of any wrongdoing, is strongly committed both to protecting the

6   important privacy interests of its account holders and to cooperating with government entities

7   investigating illegal activities or other abuses of Coinbase services.

8       For the reasons set forth below, Coinbase respectfully requests that the Court deny the

9   Government's enforcement petition.

10                          **BACKGROUND AND PROCEDURAL HISTORY**

11      **A.      Two Government Reports Criticize The IRS's Inaction On Digital Currency**

12      In 2013, the U.S. Government Accountability Office (the "GAO") published a report about

13  digital currency tax issues. *See* Declaration of Shauna Woods ("Woods Decl."), Exh. 1 ("GAO

14  Report"). The report, which was prepared at the request of the Senate Finance Committee, stated:

15          IRS has not issued guidance specific to virtual currencies … due to competing

16          priorities and resource constraints. … [T]axpayers may be unaware that

17          income from transactions using this type of virtual currency may be taxable,

18          or if they are aware, uncertain on how to characterize it. By not issuing

19          guidance, IRS may be missing an opportunity to address these compliance

20          risks and minimize their impact and potential for noncompliance.

21  GAO Report, at 16.

22      For almost a year, the IRS did nothing in response to the GAO Report. Finally, in April

23  2014, the IRS issued a notice containing guidance but no formal regulation. Woods Decl., Exh. 2

24  ("IRS Notice 2014-21"). IRS Notice 2014-21 stated that digital currency should be treated like

25  property, and not currency, for tax purposes under U.S. law. *Id.* The notice was quite short: it was

26  only 5 paragraphs long, followed by answers to 16 "frequently asked questions." The IRS did not

27  issue (and has not issued) formal rules or regulations regarding digital currency.

28

**Goodwin Procter LLP**
**601 S Figueroa Street, 41st Floor**
**Los Angeles, CA 90017**

In September 2016 – more than three years after the GAO Report, and more than two years after the release of IRS Notice 2014-21 – the Treasury Inspector General for Tax Administration released a scathing report about IRS inaction with regard to digital currency.  Woods Decl., Exh.3 ("TIGTA Report").  The TIGTA Report found that the IRS had failed to provide meaningful guidance to taxpayers and stated, "None of the IRS operating divisions have developed any type of compliance initiatives or guidelines for conducting examinations or investigations specific to tax noncompliance related to virtual currencies." *Id.* at 3.  In addition, the TIGTA Report noted that the IRS requested comments on IRS Notice 2014-21, received 36 comments from the public on various issues raised by the notice, but did not respond to any of those comments or provide further guidance. *Id.* at 10.  The TIGTA report then pointed out that the IRS did not even have "a methodology for gathering data on virtual currency use in taxable transactions—data that are necessary to analyze the risk of noncompliance and to estimate its significance." *Id.* at 13.

The TIGTA report included three specific recommendations to the IRS.  First, the report recommended that the IRS "develop a coordinated virtual currency strategy." *Id.* at 3.  Second, the report recommended that the IRS "provide updated guidance to reflect the documentation requirements and tax treatments needed for the various uses of virtual currencies." *Id.* at 11.  The Office of Audit added that "the IRS's current guidance related to virtual currencies is insufficient. To help taxpayers voluntarily comply with their tax obligations, the IRS should ... provide adequate direction in this new and complex area." *Id.* at 12.  Third, the report recommended that the IRS "revise third-party information reporting documents to identify the amounts of virtual currencies used in taxable transactions." *Id.* at 3.  The Office of Audit noted that the IRS "has already established that taxpayer compliance is higher when income is subjected to third-party information reporting. ... [B]y identifying virtual currency transactions through third-party information reporting documents, the risk of taxpayer noncompliance can be reduced." *Id.*

The IRS largely agreed with these criticisms but did note that budget constraints could preclude it from implementing the recommendations. *Id.* at 8, 11, 16.

It is now almost a year since the TIGTA Report was released, and the IRS still has not issued further guidance or developed third-party reporting rules for digital currency transactions.

**B.** **Rather Than Address Its Policy Failings, The IRS Applies *Ex Parte* For An Order Permitting Service Of A Massive John Doe Summons on Coinbase**

Approximately two months after the issuance of the TIGTA Report, the IRS filed a petition for leave to serve a John Doe summons on Coinbase. Case No. 3:16-cv-06658-JSC, Dkt. 1. The summons sought production of transaction records, security settings, user profiles, correspondence, and essentially every other document (electronic or paper) related to every single Coinbase account that was active during 2013, 2014, or 2015. *Id.*, Dkt. 2-6, at 13-15.

In support of its petition, the IRS submitted a declaration from Senior Revenue Agent David Utzke. *Id.*, Dkt. 2-4 (the "First Utzke Declaration"). Although this is not the evidence that the IRS is relying upon now, the First Utzke Declaration contains a number of telling statements:

- Mr. Utzke stated that taxpayers face a "tax compliance challenge" in that "it may be difficult for individuals receiving income from virtual currencies to determine their tax basis for calculating gains." First Utzke Decl. ¶ 29.

- Mr. Utzke stated that "in the experience of the IRS, tax noncompliance increases when there is no third-party information reporting." *Id.* ¶ 37.

- Mr. Utzke identified little evidence to support the broad summons: three anecdotes (in two, businesses misclassified bitcoin purchases as "technology expenses"), one article in the *Huffington Post* about using virtual currency to evade taxes, and the results of a Google search for "avoid taxes with bitcoin." *Id.* ¶¶ 30-34, 36, 55.[1]

Pursuant to 26 U.S.C. § 7609(h)(2), the IRS's petition was submitted on an *ex parte* basis, with no opposition permitted under the statute. On November 30, 2016, this Court granted the petition. Case No. 3:16-cv-06658-JSC, Dkt. 7. The summons was then duly issued and served.

**C.** **The IRS Brings This Enforcement Action**

Following service of the John Doe summons, Coinbase and the IRS engaged in discussions regarding the scope of the John Doe summons. Coinbase declined to comply with the summons.

---

[1] Running a Google search for "avoid taxes with bitcoin" will, of course, provide some results that suggest that some people may seek to avoid paying taxes. Although a Google search using Mr. Utzke's terms generates 435,000 results, performing a similar search on the phrase "paying taxes on bitcoin" generates 12 million results – 11.5 million more results. Woods Decl. ¶ 6.

On March 16, 2017, the IRS initiated this proceeding by filing a petition to enforce the John Doe summons. Dkt. 1. In support, the IRS submitted a new declaration from Senior Revenue Agent Utzke (as subsequently corrected, Dkt. 3) (the "Second Utzke Declaration").

The Second Utzke Declaration is notably different from the First Utzke Declaration. Mr. Utzke no longer refers to the IRS's own failures to provide guidance to taxpayers or to develop third-party reporting requirements. Nor does he refer to Google searches, *Huffington Post* articles, or anecdotes about businesses misclassifying bitcoin purchases as expenses. Instead:

- Mr. Utzke states that the IRS "is conducting an investigation to determine the identity and correct federal income tax liability of United States persons who conducted transactions in a convertible virtual currency ... for the years ended December 31, 2013, 2014, and 2015." Second Utzke Decl. ¶ 2.

- The sole evidence of tax evasion offered by Mr. Utzke is a series of searches apparently performed by someone at "the IRS" (Mr. Utzke does not say who). According to Mr. Utzke, approximately 83-84 percent of taxpayers file returns electronically, and those returns can be reviewed in a database called the Modernized Tax Return Data Base ("MTRDB"). *Id.* ¶¶ 11-12.

- Mr. Utzke states that IRS Form 8949 is the form that should be used to report income from the sale of property (including digital currency) and has a space in which the taxpayer is asked to report the type of property that was sold. Based upon the search performed by "the IRS," only 800-900 persons filed a Form 8949 in each of the years 2013-15 that included a property description that is, according to Mr. Utzke, "likely related to bitcoin" (a phrase that Mr. Utzke does not define or explain). *Id.* ¶¶ 11, 13.

- Mr. Utzke discusses the nine broad categories of information in the summons and attempts to show how each would assist the IRS in determining the identity and/or tax liability of each Coinbase account holder. *Id.* ¶¶ 26-35.

**D. The Court Sets A Briefing Schedule**

After receiving the Government's petition, the Court issued an order stating that although the "ordinary course" in an enforcement action "is to issue an order to show cause," here the Court

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

was asking the parties to propose a briefing schedule. Dkt. 9 at 1. The parties then proposed, and the Court set, a briefing schedule. Dkt. 20, 22. The Court did not enter an order to show cause or make any determination about whether the Government had established its prima facie case.

**E.      Members of Congress Criticize The IRS For Its Broad Summons To Coinbase**

On May 17, 2017, three senior members of Congress who hold positions on committees that have "exclusive jurisdiction over federal revenue measures" (Orrin G. Hatch, the Chair of the Senate Committee on Finance; Kevin Brady, the Chair of the House Ways and Means Committee; and Vern Buchanan, the Chair of the Oversight Subcommittee of the House Ways and Means Committee) sent a letter to the Commissioner of the Internal Revenue Service that stated their clear disapproval of the IRS summons here. The letter stated:

> [W]e strongly question whether the IRS has actually established a reasonable
> basis to support the mass production of records for half of a million people,
> the vast majority of whom appear to not be conducting the volume of
> transactions needed to report them to the IRS. Based on the information
> before us, this summons seems overly broad, extremely burdensome, and
> highly intrusive to a large population of individuals. The IRS's actions in this
> case also set a dangerous precedent for companies facilitating virtual currency
> transactions that could be subject to a similar summons.

Woods Decl., Exh. 5. The next month, the Co-Chairs of the Congressional Blockchain Caucus, Jared Polis and David Schweikert, wrote a letter asking the IRS "to consider the recommendations of the TIGTA" and "to engage with virtual currency exchanges to better understand their ability to engage in information reporting, including recordkeeping to track realized gain or loss and identify the amounts of virtual currency used in taxable transactions." *Id.*, Exh. 6.

**F.      The Court Holds A Hearing On The Intervention Motion**

Three Coinbase account holders (Does 1, 2, and 3) moved to intervene to oppose the petition. At a hearing on the intervention motions, the Court questioned the IRS's position that the account holders had no protectable interest and asked the Government's attorney:

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

1        [T]here are lots of people, thousands, tens of thousands that don't file tax

2        returns at all and yet have bank accounts[.]  Could the IRS then issue a

3        subpoena to Bank of America for every single account that it has, every single

4        account in the country?

5 Woods Decl., Exh. 7, at 7:8-12; *see also id.* at 13:8-10 ("Americans would be a little bit surprised

6 if they thought that the Congress had said the IRS can go subpoena this broad swath of

7 [information]."); *id.* at 13:23-25 ("I don't think that the Court is so powerless that it can just say, I

8 can't do anything, the IRS could subpoena every single bank record in the country and that's it.").

9        At the hearing, the Government stated that it would narrow the summons. *Id.* at 14:19-20.

10     **G.**    **IRS Files Notice of Narrowing of Summons**

11        On July 6, 2017, the IRS filed a "Notice of Narrowed Summons Requests For

12 Enforcement." Dkt. 37. As modified, the IRS now seeks information regarding accounts "with at

13 least the equivalent of $20,000 in any one transaction type (buy, sell, send, or receive) in any one

14 year during the 2013-2015 period." *Id.* at 2.[2] Coinbase has determined that the modified

15 summons still requests information regarding more than 8.9 million transactions and 14,355

16 account holders. Declaration of Jeff Cartwright ("Cartwright Decl.") ¶¶ 4-6.

17        For those accounts, the IRS seeks the following categories of information:

18     (a) Request 1: Name, address, tax identification number, date of birth, account

19          opening records, copies of passport or driver's license, all wallet

20          addresses, and all public keys for all accounts/wallets/vaults.

21     (b) Request 2: Records of Know-Your-Customer diligence.

22     (c) Request 3: Agreements or instructions granting a third-party access,

23          control, or approval authority.

24     (d) Request 4: Records of all transactions, identifying the date, amount, and

25          type of transaction (purchase/sale/exchange), the post transaction balance,

26          the names or other identifiers of counterparties to the transaction; requests

27

28    [2] The IRS has excluded (a) users who "only bought and held" bitcoin during the 2013-15 period, and (b) accounts for which Coinbase filed a Form 1099-K during the 2013-2015 period.

or instructions to send or receive bitcoin; and, where counterparties transact through their own Coinbase accounts/wallets/vaults, all available information identifying the users of such accounts and their contact information.

(e) Request 6: Correspondence between Coinbase and the user or any third-party with access to the account/wallet/vault pertaining to the account/wallet/vault opening, closing, or transaction activity.

(f) Request 7: All periodic statements of account or invoices (or the equivalent).

Dkt. 37 at 2; Dkt. 1-2, at 6. The IRS did not file a declaration or other evidence with this notice.

## H. Court Grants Intervention Motion

Following the narrowing of the summons, the parties stipulated that a new anonymous intervenor, John Doe 4, could substitute in for Does 1 and 2 (who were no longer within the scope of the summons). Dkt. 39. On July 18, 2017, the Court approved the motion of John Doe 4 to intervene. Dkt. 40. Again, the Court questioned the scope of the initial summons:

Under [the Government's] reasoning the IRS could request bank records for every United States customer from every bank branch in the United States because it is well known that tax liabilities in general are under reported and such records might turn up tax liabilities. It is thus no surprise that the IRS cannot cite a single case that supports such broad discretion to obtain records of every bank-account holding American.

*Id.* at 8.

## **ARGUMENT**

An IRS summons is not a self-enforcing legal document. Rather, to enforce a summons, the IRS must file a petition with a United States District Court seeking an order compelling compliance with the summons. 26 U.S.C. § 7604. As the Ninth Circuit has explained:

[T]he Government must seek enforcement from a federal district court if the person on whom a summons has been served refuses to comply. To obtain

enforcement …, the Government must establish that its use of the summons is

"in good faith pursuit" of the purposes authorized by Congress.

*United States v. Samuels, Kramer & Co.*, 712 F.2d 1342, 1344 (9th Cir. 1983) (quoting *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 318 (1978)).

In an enforcement proceeding, the initial burden is on the IRS to present a *prima facie* case for enforcement.  To do so, the IRS must present evidence sufficient to establish four elements:

(1) "that the investigation will be conducted pursuant to a legitimate purpose";

(2) "that the inquiry may be relevant to the purpose";

(3) "that the information sought is not already within the [IRS's] possession"; and

(4) "that the administrative steps required by the Code have been followed."

*United States v. Powell*, 379 U.S. 48, 57-58 (1964).  If the IRS makes this showing, the burden then shifts to the respondent, who must then either (a) rebut the Government's evidence on the four elements of its *prima facie* case, or (b) show that the enforcement petition is an abuse of process because (for example) it has been issued for an improper purpose or in bad faith.  *Id.* at 58; *see also LaSalle Nat'l Bank*, 437 U.S. at 313-14; *Samuels, Kramer & Co.*, 712 F.2d at 1344-45; *United States v. Church of Scientology*, 520 F.2d 818, 821 (9th Cir. 1975) .

An enforcement proceeding is not a judicial "rubber stamp" of an IRS's summons.  Rather, the district court must conduct its own independent review of the evidence to ensure that the IRS is not overreaching, engaging in harassment, acting in bad faith, or otherwise attempting to abuse the summons power or the process of the court.  *See Powell*, 379 U.S. at 58 ("It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused.").  Courts "recognize that the authority vested in tax collectors may be abused, as all power is subject to abuse."  *United States v. Bisceglia*, 420 U.S. 141, 146 (1975).  "Once a summons is challenged it must be scrutinized by a court to determine whether it seeks information relevant to a legitimate investigative purpose and is not meant 'to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.'"  *Id.* at 151 (quoting *Powell*, 379 U.S. at 58); *see also,*

1   *e.g., United States v. Goldman*, 637 F.2d 664, 667 (9th Cir. 1980) (denying petition in part); *Samuels,*

2   *Kramer & Co.*, 712 F.2d at 1344 (ordering an evidentiary hearing).[3]

3       Here, the Government has failed to present evidence of the first two elements of its prima

4   facie case: the IRS has not shown that its extraordinarily broad summons, seeking more than 8.9

5   million transaction records and other information from more than 14,000 Coinbase accounts,

6   (1) was issued for a proper investigatory purpose or (2) requests information that is relevant to the

7   purported investigatory purpose.  Moreover, enforcement should also be denied because of the

8   Government's overreaching and abuse of process.

9       Finally, if the Court is inclined to grant the petition, then (a) Coinbase requests an

10  evidentiary hearing at which Mr. Utzke may be questioned; and (b) Coinbase also requests that

11  notice be provided to affected individuals so that they may have the opportunity to assert any

12  rights that they may have to resist disclosure of their identities and personal financial information.

13  **I.    AS A THRESHOLD MATTER, THE IRS HAS NOT DEMONSTRATED THAT IT IS ACTING TO**

14  **FURTHER A PROPER ENFORCEMENT PURPOSE.**

15      Before the IRS may obtain and paw through the private financial records of U.S. taxpayers,

16  the IRS must lawfully issue a summons.  The power of the IRS to issue a summons is established

17  in 26 U.S.C. § 7602(a), which states that the IRS may issue a summons:

18          [f]or the purpose of ascertaining the correctness of any return, making a return

19          where none has been made, determining the liability of any person for any

20          internal revenue tax or the liability at law or in equity of any transferee or

21          fiduciary of any person in respect of any internal revenue tax, or collecting

22          any such liability.

23      As a threshold matter, then, Congress permits the IRS to issue a summons only for a

24  "legitimate investigative purpose."  *Bisceglia*, 420 U.S. at 146.  The IRS may not issue a summons

25  _____

26  [3] Similarly, the Government commonly seeks a warrant or wiretap order without notice to the
    individual; although the Court must initially approve the wiretap or warrant, the individual is still

27  later permitted to object and argue that his privacy was infringed improperly or that there were
    defects in the application or order.  *See, e.g., United States v. Donovan*, 429 U.S. 413, 433-34

28  (1977).  Here, although this Court granted an *ex parte* petition to permit service of the summons,
    this Court must still make a further inquiry now to ensure that enforcement is proper.

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

"to conduct 'fishing expeditions' into the private affairs" of taxpayers." *Id.* at 150-51. Nor may the IRS use the summons power to conduct general or background "research projects or inquiries, absent an investigation of taxpayers or individuals and corporations from whom information is sought." *United States v. Humble Oil & Refining Co.*, 488 F.2d 953, 962-63 (5th Cir. 1974), *vacated and remanded*, 421 U.S. 943 (1975), *aff'd per curiam*, 518 F.2d 747 (5th Cir. 1975). And, of course, it goes without saying that the IRS cannot issue a summons for a public relations purpose or simply to "send a message" to taxpayers or Congress. *But see* Woods Decl., Exh. 8. (U.S. Department of Justice Press Release, Nov. 30, 2016), at 1 ("Tools like the John Doe summons authorized today send the clear message to U.S. taxpayers that whatever form of currency they use – bitcoin or traditional dollars and cents – we will work to ensure that they are fully reporting their income and paying their fair share of taxes.").

In support of its enforcement petition, the only evidence offered by the Government is the Second Utzke Declaration. That declaration, however, raises more questions than it answers.

As an initial matter, it is not clear what portions of the Second Utzke Declaration (if any) are competent testimony supported by personal knowledge. Mr. Utzke states that he is a Senior Revenue Agent "assigned to the IRS's Offshore Compliance Initiatives program," Second Utzke Declaration ¶ 1, but the declaration does not establish any relationship between the "Offshore Compliance Initiatives program" and the IRS's enforcement activities. Coinbase is headquartered in San Francisco, California – not offshore – and U.S. account holders may buy, sell, or transfer bitcoin both within the United States and across international borders. Moreover, in a critical portion of his declaration, Mr. Utzke describes certain searches that purport to show evidence of underreporting of income, but he states that those searches (and a judgment call about what is "likely related to bitcoin") were made by "the IRS" – with no indication of his own personal involvement or any other foundation in his personal knowledge. *See id.*, ¶¶ 11-13.

With regard to the purpose of the summons, Mr. Utzke states, in conclusory fashion, that the IRS "is conducting an investigation to determine the identity and correct federal income tax liability of United States persons who conducted transactions in a convertible virtual currency … for the years ended December 31, 2013, 2014, and 2015." *Id.*, ¶ 2. Even accepting this statement

at face value as a factual matter, however, Mr. Utzke's statement does not establish the *legal question* of whether the IRS has issued the John Doe summons for a *proper enforcement purpose* under section 7602. Although the IRS may decide how to expend its enforcement resources, the question of whether a summons is issued for a proper enforcement purpose under section 7602 is a legal question, and the courts need not defer to broad proclamations of the scope of "investigations" stated by IRS declarants. Indeed, tomorrow the IRS could announce that it is investigating the "correct federal income tax liability" of anyone who has used cash to pay for any goods or services at any time in the past three years, but that would hardly establish that (as a legal matter) there would be a proper enforcement purpose for a John Doe summons seeking all bank records for three years for any U.S. person who used an ATM during that period.

As evidence of underreporting of income from digital currency transactions, the critical passage of Mr. Utzke's declaration is in paragraphs 11-13. There, Mr. Utzke explains that he gathered certain information based upon searches conducted in the Modernized Tax Return Data Base ("MTRDB"), "which contains some of the information reported on electronically filed tax returns." *Id.* ¶ 11. Mr. Utzke then states (a) taxpayers should use Form 8949 to report capital gains or losses from property transactions, (b) Form 8949 has a section in which taxpayers are asked to provide a description of property sold, (c) the MTRDB captures the property descriptions included on Forms 8949 that are submitted as part of electronically filed returns, and (d) the IRS has the capability to query and search those property descriptions. *Id.* Because, according to the IRS's guidance, taxpayers should treat digital currency transactions as property transactions, Mr. Utzke appears to hypothesize that all taxpayers who reported income from digital currency transactions would have used Form 8949 to report that income and would have included in the property description on Form 8949 some reference to the sale of bitcoin or other digital currency. *See id.* ¶¶ 11, 13. Mr. Utzke then goes on to state that, based upon the searches performed by "the IRS," fewer than 900 individuals "reported a transaction on Form 8949 using a property description likely related to bitcoin" in each of the years 2013, 2014, and 2015. *Id.* ¶ 13.

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

1    Although Mr. Utzke does not say so, he appears to suggest that this is the evidence of

2    underreporting that the IRS is relying upon to support the John Doe summons to Coinbase.  Mr.

3    Utzke's analysis, however, is fundamentally flawed in a number of important respects.

4    First, it is obviously inaccurate to suggest, as Mr. Utzke does, that Form 8949 is the only

5    place where a taxpayer might report income from digital currency transactions.  As Mr. Utzke

6    himself recognizes, *see id.* ¶ 9, some taxpayers may receive bitcoin as wages (reportable on line 7

7    of Form 1040) or as payment for services delivered as an independent contractor (reportable as

8    business income on line 12 of Form 1040 and on Schedule C).  In addition, a taxpayer who

9    considered bitcoin to be interest income could report the value on line 8a of Form 1040 (and on

10   Schedule B); a taxpayer who received bitcoin as alimony could report the value on line 11 of Form

11   1040; and a taxpayer who disagreed with the guidance provided by the IRS could use Form 6781

12   (and Schedule D) to report income from bitcoin trades as a foreign currency gain.  Other, more

13   complex, possibilities also exist, but the key point is that it is not accurate to suggest that Form

14   8949 is the only place that a taxpayer could possibly report bitcoin income.

15   Second, Mr. Utzke relies on a search of the MTRDB, which includes only electronic

16   returns.  *Id.*, ¶ 11.  During the 2013-15 time period, however, approximately 71 million tax returns

17   were filed on paper.  *See id.*, ¶ 12.  Mr. Utzke appears to *assume* that there is no significant

18   difference between electronic and paper returns with regard to digital currency income reporting,

19   but he offers no evidence to support this assumption – and, indeed, it may be incorrect.  Taxpayers

20   who use Form 8949 (to report income from bitcoin or other property transactions) cannot submit

21   their federal return for free electronically through websites such as TurboTax.  Woods Decl., ¶ 11,

22   Exh. 9.  To fill this need, some companies offer free paper tax returns for reporting bitcoin income

23   (including Form 8949).  *See* Woods Decl., ¶ 12, Exh. 10.  Those who wish to file electronically,

24   however, must pay $80 to file after importing the information into TurboTax or another service.

25   *Id.*, Exh. 10*; see also id.*, Exh. 11 ("The only other free option is by paper ….").  As such, many

26   taxpayers reporting digital currency income may in fact disproportionately file paper returns.

27   Third, Mr. Utzke offers the Court his count of the property descriptions on Forms 8949 in

28   the MTRDB.  But with regard to those descriptions, which Mr. Utzke himself regards as critical to

his analysis, Mr. Utzke is strikingly vague.  He provides a count of property descriptions "likely related to bitcoin," but he does not explain how he (or someone else at the IRS) determined that a particular description on a Form 8949 was, or was not, "likely related to bitcoin."  Mr. Utzke is silent on the details about what searches were run to identify property descriptions "likely related to bitcoin."  *Id.*, ¶ 13.  Did he search for "bitcoin," "virtual currency," "digital currency," "cryptocurrency," "BTC," or "bitcoins"?  Mr. Utzke is silent on this point.

Fourth, another explanation for the relatively low volume of reporting identified by Mr. Utzke may be that there simply was not much gain to report during the period.  The price of bitcoin fluctuates over time, but it reached a relative peak in November 2013 at a value of more than $1,000 per coin.  A period of general decline then followed through the remainder of 2013 and all of 2014 and 2015, with bitcoin losing approximately 75 percent of its value and the price hitting relative lows of just more than $200 per coin in January and August 2015, and then rallying to end 2015 at $428 per coin.  Woods Decl., Exh. 12.  Taxpayers who purchased at the high prices of late 2013 and then sold in 2014 or 2015 likely experienced losses, not taxable gains, and therefore had no income from bitcoin to report (whether on a Form 8949 or elsewhere).

Finally, the IRS never offered a supplemental declaration from Mr. Utzke (or any other evidentiary basis) to support the modified scope of the summons.  In narrowing the scope of the summons, the Government has clearly conceded that the factual basis for its original summons was deficient: after repeatedly telling the Court that it needed *all* of the information sought by its original summons, the Government has jettisoned this position and now insists that its "narrower" request is sufficient.  The Government's convenient change in position—coupled with its concession that its original summons was overbroad—raises substantial questions as to the evidentiary basis of the Government's position with regard to a proper enforcement purpose.  These questions remained unanswered, and the narrowing remains unexplained and arbitrary.

Accordingly, the information contained in the Second Utzke Declaration does not satisfy the Government's burden of establishing, through evidence, the first element of its prima facie case.  For that reason alone, the petition to enforce should be denied.

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA  90017

II. **THE IRS HAS NOT SHOWN THAT THE MODIFIED SUMMONS, WHICH REQUESTS MORE THAN 8.9 MILLION TRANSACTION RECORDS AND OTHER INFORMATION FROM 14,355 ACCOUNTS, SEEKS INFORMATION THAT IS RELEVANT TO THE IRS'S PURPOSE**

The Government's petition should also be denied for a second, independent reason: even when the IRS issues a summons for a proper enforcement purpose, the information sought must be "relevant" to that purpose. 26 U.S.C. § 7602(a)(2). In this context, courts do not apply the technical meaning of the term "relevance" under the Federal Rules of Evidence. *U.S. v. Arthur Young & Co.*, 465 U.S. 805, 814 (1984). Instead, to protect taxpayers from overreaching and inappropriate intrusions by the IRS into their personal financial information, courts have held that the Government must satisfy two separate requirements.

First, the Government must show that the summons is "no broader than necessary to achieve its purpose." *Bisceglia*, 420 U.S. at 146.

Second, the Government must show that the information may "throw light" on the correctness of a return. *See, e.g., Arthur Young & Co.*, 465 U.S. at 813-15. Moreover, because, in the abstract, almost anything could possibly "throw light" on the correctness of a return, the Ninth Circuit requires that there must be "in the particular circumstances" an "indication of a realistic expectation rather than an idle hope that something may be discovered." *David H. Tedder & Assocs. v. U.S.*, 77 F.3d 1166, 1168-69 (9th Cir. 1996); *see also, e.g., Goldman*, 637 F.2d at 667.

Here, the information sought by the IRS satisfies neither of these requirements.

A. **The Modified Summons Is Substantially Overbroad.**

The Government has not shown that it satisfied the requirement that the IRS summons be "no broader than necessary to achieve its purpose." *Bisceglia*, 420 U.S. at 146. To the contrary, the evidence in the record shows that the IRS summons is substantially overbroad.

When Congress codified the authority for the IRS to issue John Doe summonses, it struggled with the potential for abuse and overreaching by the IRS. The legislative history demonstrates overwhelmingly that Congress contemplated that the IRS would use a John Doe summons only when it would be limited in scope (such as to obtain the identity of no more than a handful of individual taxpayers) and only when there was strong indicia of wrongdoing. In other

words, Congress provided the IRS with the authority to issue a John Doe summons when wrongdoing was apparent but the identity of the wrongdoer was not.

For example, the House Ways and Means Committee report explained, "when the [IRS] does seek court authorization to serve [a] John Doe summons, it will have specific facts concerning a specific situation to present to the court." Woods Decl., Exh. 13 (H.R. Rep. No. 94-658 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 2897, 3207). The Senate Finance Committee report stated that a John Doe summons should issue only when the IRS has "knowledge of a particular transaction or transactions which may affect tax liability." Woods Decl., Exh. 14 (S. Rep. No. 938-Part I, 94th Cong. 2d Sess. 367-68, *as reprinted in* 1976 U.S.C.C.A.N. 3439, 3801). The report stated that it contemplated that the IRS would "ma[ke] sparing use of this investigative tool," issuing a John Doe summons only "where the facts of a particular case are so suggestive of possible tax liability that the [IRS would] be remiss in its duty … if it did not investigate." *Id.* at 3801-02. The committee also stated that it did "not intend that the John Doe summons is to be available for the purposes of enabling the [IRS] to engage in a possible 'fishing expedition.'" *Id.*

Thus, the scope of a John Doe summons is appropriate *where specific facts support a suspicion of wrongdoing by someone*, and the IRS is seeking to discover *the identity* of those who may have violated the law. And, indeed, the reported cases reaffirm that limitation. For example:

- In *Bisceglia*, the IRS sought the identity of a single person who in 1970 deposited $40,000 (the equivalent of almost $250,000 in 2017 dollars) in $100 bills. 420 U.S. at 143. The IRS issued a John Doe summons, and the court enforced it after limiting it to the information necessary to identify the depositor. But the IRS could not have used a John Doe summons to obtain all banking transaction records of all account holders who had made cash deposits at the bank during the relevant period.

- In *United States v. Sidley Austin Brown & Wood*, 2004 WL 816448 (N.D. Ill. Apr. 15, 2004), the IRS had evidence to show that a law firm partner was involved in a scheme to promote abusive tax shelters. The IRS issued a John Doe summons to identify the firm clients who had participated in the shelters but did not seek information regarding all of the firm's clients or all communication between the firm and its clients. *Id.* at *1.

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

- Similarly, in *Samuels, Kramer & Co.*, the IRS sought to issue John Doe summonses to identify the clients of two businesses that the IRS had already identified as promotors of abusive tax shelters. 712 F.2d at 1344. Even so, the Ninth Circuit reversed the enforcement order based upon separate evidence of bad faith. *Id.* at 1347-48; *see also, e.g., In re Tax Liabilities of John Does (Agricultural Asset Mgmt Co.)*, 688 F.2d 144, 146 (2d Cir. 1982) (affirming enforcement of John Doe summons to obtain list of investors in improper cattle herd financing tax shelters promoted by summons recipient); *United States v. Mutschler & Assocs.*, 734 F.2d 363, 364-65 (8th Cir. 1984) (John Doe summons issued to enable IRS to obtain list of clients of company after IRS noticed that several of the company's clients had submitted inaccurate tax returns).

- And *In re Tax Liabilities of John Does (Mastercard Payment Cards)*, 2002 WL 32881074, at *1 (S.D. Fla. Oct. 31, 2002), the court granted an *ex parte* petition for the IRS to serve John Does summonses on 21 merchants to obtain the identifies of U.S. taxpayers making purchases with foreign credit and debit cards from banks in Antigua, Barbuda, the Bahamas, or the Cayman Islands. The court noted that those countries "have a history and reputation of being offshore tax havens," and so the usage of such payment cards "reasonably suggests the purpose of … tax avoidance." *Id.* (The summons recipients apparently did not contest enforcement.)

The contrast between the reported case and the case now before this Court could not be more stark. In each of the reported cases, the IRS had a *targeted, specific* reason to believe that the John Does were part of a *discrete and identifiable* group of individuals evading taxes – whether by parking money in banks in overseas havens, depositing large amounts of cash, or dealing with a firm providing advice about abusive tax shelters. Here, in contrast, that element is completely missing. There is absolutely nothing illegal in buying, selling, or transferring bitcoin or other digital currencies, and Coinbase itself is not accused of any wrongdoing.

Instead, the IRS seeks the private financial records of 14,355 Coinbase account holders, without any indication that any of them (much less all of them) have done anything illegal or even engaged in any suspicious activity. Indeed, excluding transactions in which the account holder

purchased bitcoin with U.S. dollars (because a purchase of bitcoin or other property is generally not a taxable event), approximately 40 percent of the accounts have an average of less than $20,000 of activity per year for the three year period. Cartwright Decl. ¶ 7. The potential tax liability for these accounts is very small. For example, an individual in the middle of this range who sold $10,000 of bitcoin in a year and made a healthy 15 percent profit (even though the bitcoin price was generally declining in this period, *see* Woods Decl., Exh. 12) would have only $1,500 in gain, and a tax liability (in the 25 percent tax bracket) of only $375. The IRS is unlikely to audit individuals with such small tax liabilities, particularly given the severe budget constraints under which it is currently operating. *See* Woods Decl., Exh. 3 at 8, 11, 16. The IRS is certainly not going to audit all 14,355 Coinbase account holders, or even any significant fraction of that number. As a result, all that enforcement of this summons would accomplish is that it would permit the IRS – without a legitimate enforcement reason – to scour through the private financial records of millions of transactions by thousands of law abiding account holders that the IRS has no interest in auditing. Such a request by the IRS is manifestly overbroad on its face.

In addition, the IRS offers no evidence for the lines it has drawn. For example, the IRS has not explained why it suspects that an account holder who bought $20,000 in bitcoin and sold $5 worth of bitcoin in one year is more likely to have tax compliance issues than someone who bought $19,000 in one year – or than someone who sold $19,000 in bitcoin every year, for three years in a row. Even though the IRS has recognized that its original summons was grossly overbroad, the modified summons remains overly broad, as the IRS neither limited the scope of the summons to those accounts that have some indicia of wrongdoing nor provided any explanation as to what criteria the IRS used in narrowing the scope of the summons. As such, and on this record, the summons remains unrelated to any evidence presented to the Court that would support the IRS's apparent suspicion of wrongdoing and is therefore overly broad.

Finally, the summons is overly broad in that it seeks huge amounts of information that *would be of little or no value to the IRS* – but that is extraordinarily burdensome and expensive to produce. The Government says that it seeks only documents "necessary to identify these taxpayers and determine whether or not they've complied with their tax obligations." Woods

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

Decl., Exh. 7, at 16:9-13; *see also* Second Utzke Declaration, ¶ 26. If that were the case, however, then all that the IRS would ask for is a spreadsheet identifying each account holder (by name, address, and social security number) and the dollar value of transactions in each account (broken down by year, and perhaps further broken down by the value of sales, purchases, send transactions, and receive transactions in each year). Instead, the IRS seeks documents that go far beyond what is needed to identify users and transaction amounts. Specifically, the IRS seeks:

- <u>All wallet addresses and public keys for all accounts (Request One)</u>. Digital currency transactions are commonly effected by using either wallet addresses or public keys to send bitcoin from one person to another. Declaration of Philip Martin ("Martin Decl.") ¶¶ 3-5. Coinbase generally uses addresses, rather than public keys, for security reasons, and common blockchain tracing techniques look to addresses, not public keys. *Id.* ¶ 4. Mr. Utzke does not explain why the IRS is seeking this information, and in fact providing this information is entirely unnecessary for identifying each user's transactions. *Id.* ¶ 7. Rather, the transactions associated with each account can be obtained through the user's historical transaction logs. *Id.* Moreover, the burden of extracting and producing the addresses and keys associated with more than 8.9 million transactions is extraordinary and would likely require between 40 and 80 hours of engineering work and would likely cost Coinbase more than $10,000-$15,000. *Id.* ¶ 6.

- <u>"Know Your Customer" diligence materials (Requests One and Two)</u>. The Government requests copies of drivers' licenses, passports, and other diligence materials (which can include bank statements, utility bills, corporate documents for corporate clients, and internal compliance documentation). Martin Decl. ¶ 8. Although Mr. Utzke speculates that these materials "may be relevant" in identifying users, Second Utzke Declaration ¶¶ 27(a), 28, the identifying information can be obtained far more directly and easily from the name, address, and social security number fields in Coinbase's records. Martin Decl. ¶ 9. The burden on Coinbase in producing this unnecessary information is quite significant, as much of the information is – for obvious security reasons – not stored in a matter that allows for ready retrieval.

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

Although Coinbase could develop and test workarounds to gather this information, this is a task that would likely require 60-120 hours of engineering work and would likely cost Coinbase approximately $15,000-$20,000, and possibly more. *Id.* ¶ 8.

- <u>Third-party access documents (Request Three)</u>. The IRS claims that it seeks this information to identify account holders who have used "an alias, pseudonym, or … a nominee," but Mr. Utzke presents no evidence that any Coinbase user has ever done so. Second Utzke Declaration ¶ 29. Although this would likely involve only a very small number of accounts, production would require a manual review of documentation for all 14,355 accounts. Cartwright Decl. ¶ 8. This would likely take at least four weeks of work, if not longer, and would likely return little (if any) responsive information. *Id.*

- <u>Transaction Logs and counter-party information (Request Four)</u>. The IRS seeks a massive amount of information regarding detailed, transaction-level information pertaining to more than 8.9 million separate transactions across 14,355 accounts. Martin Decl. ¶ 11. This information is not readily available for download in bulk format, and to develop a method to download and transmit all of the information would likely require 40-80 hours of engineering work and would likely cost Coinbase approximately $10,000-$15,000, and possibly more. *Id.*

- <u>Communication regarding account opening, closing, or transaction activity (Request Six)</u>. The Government's request, although allegedly "narrowed," would still require the production of essentially all communications between Coinbase and its customers. This information is not relevant to identifying taxpayers or potential tax liabilities, but it would be very expensive to gather and produce. Most of these communications are stored in a third-party database, and developing a method for the bulk production of these documents would likely require 60-120 hours of engineering work and would likely cost Coinbase approximately $15,000-$20,000, and possibly more. *Id.* ¶ 12.[4]

---

[4] Request Number 7 asks for the production of "periodic statements of account," but Coinbase does not provide such statements to its customers. Martin Decl. ¶ 13.

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

In sum, although the John Doe summons is a legitimate tool for the IRS to use in enforcing tax laws, a legitimate tool can become illegitimate, and even abusive, if used in an overly broad or otherwise improper manner.  A John Doe summons cannot be used to seek financial information from a broad category of people based merely on generalized concerns about the potential for not reporting taxes.  If that were the case, then the IRS could seek every single banking record of every single person in the country based merely on a declaration from an IRS agent that he or she believes that some people who don't pay taxes have bank accounts.  But as this Court has already noted, the summons power of the IRS does not go that far.  Woods Decl., Exh. 7, at 7:5-12.[5]

**B.**     **The IRS Has Only An "Idle Hope," And Not A "Realistic Expectation" That The Information Sought Will Promote Proper Enforcement Purposes.**

The Government has also not shown that it can satisfy the Ninth Circuit's "realistic expectation rather than an idle hope" requirement.  This aspect of the relevance requirement requires a court to consider the relationship between what the IRS says it is investigating and the information that the IRS seeks through the summons.  For example, in *Goldman*, the IRS was investigating a taxpayer's liability for the years 1973-76 and issued a summons to his accountant for documents pertaining to the years under investigation plus three prior years. 637 F.2d at 666.  The district court enforced the summons for the tax years at issue but denied enforcement for the other years; although the IRS speculated that it was possible that something in the previous years might provide some insight into the years under investigation, the Ninth Circuit affirmed the

---

[5] More than 40 years ago, Justice Potter Stewart presciently predicted the potential for precisely this type of mischief in a dissenting opinion in the *Bisceglia* case (joined by Justice Douglas):

> Every day the economy generates thousands of sales, loans, gifts, purchases, leases, deposits, mergers, wills, and the like which – because of their size or complexity – suggest the possibility of tax problems for somebody.  Our economy is "tax relevant" in almost every detail.  Accordingly, if a summons could issue for any material conceivably relevant to "taxation" – that is, relevant to the general duties of the IRS – the Service could use the summons power as a broad research device.  The Service could use that power methodically to force disclosure of whole categories of transactions and closely monitor the operations of myriad segments of the economy on the theory that the information thereby accumulated might facilitate the assessment and collection of some kind of a federal tax from somebody. … But Congress has provided otherwise.

*Bisceglia*, 420 U.S. at 154 (Stewart, J., dissenting).

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA  90017

ruling of the district court, holding that the IRS's speculation was nothing more than "idle hope." *Id.* at 666-67. Similarly, in *Tedder*, the IRS was auditing a law firm and issued a summons to a bank for the law firm's transaction records; the law firm moved to quash, objecting to the production of information that would reveal the names of the firm's clients. 77 F.3d at 1168. The district court held that the *names* of firm's clients were not relevant to the issue of the firm's tax liability and granted the motion to quash. *Id.* The Ninth Circuit affirmed, again ruling that the IRS was on the wrong side of the "idle hope"/"realistic expectation" line. *Id.* at 1169-70.

When the IRS is investigating conduct that gives rise to a specific or targeted suspicion – such as, in the cases cited above, making large cash deposits, promoting abusive tax shelters, or using a credit card issued by a bank in an offshore tax haven – courts may find that the names and identities of clients or customers are relevant material that may be sought through a John Doe summons. In that situation, there is a "realistic expectation" that the information covered by the summons will serve the IRS's enforcement purpose. But here, in contrast, all that the Coinbase account holders have done is buy, sell, or transfer digital currency, conduct that is not itself illegal or inherently suspicious. Thus, the IRS has only an "idle hope" – and not a "realistic expectation" – that somewhere in the huge mountain of documents the IRS is requesting there might be something that might somehow reveal, in some small part, non-compliance.[6]

### C. The Narrowing Of The Summons, Although Welcome, Does Not Cure The Summons Of Its Overbreadth

The Government may also argue that its Notice of Narrowing shows that it is not overreaching or engaging in a fishing expedition but is instead seeking only documents that are relevant to its investigative purpose. That argument, however, cannot withstand scrutiny.

The Government must produce evidence to support each element of its prima facie case, but, as noted above, the narrowing of the summons was not accompanied by any supplemental declaration from Mr. Utzke or anyone else at the IRS explaining why the summons, as narrowed,

---

[6] The Government has stated that it believes the IRS can issue a summons for any reason, including "just because it wants assurance that the law is not being violated." Dkt. 28, at 8. Although that is the standard for grand jury subpoenas, an IRS summons must satisfy the requirements of 26 U.S.C. § 7602. *See Powell*, 379 U.S. at 57-58.

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

would further the IRS's enforcement purposes. Even as modified, the IRS still seeks the production of more than 8.9 million transaction records plus other financial account records regarding more than 14,000 Coinbase account holders. That is a huge amount of information, particularly when compared to the prior instances of enforcement proceedings involving John Doe summonses. The IRS has not offered *any* evidence to support the lines it has drawn or to explain why it narrowed the summons.

To be sure, seeking account records of more than 14,000 people is less excessive and overreaching than 500,000 people – but it is still excessive and overreaching. The Government has simply not made out its prima facie case to show, with evidence, how or why the narrowed summons furthers a proper enforcement purpose.

The narrowing of the summons, by itself, cannot answer the questions of relevance and overbreadth. This is an arbitrary and improper "fishing expedition," an effort to obtain a vast array of transaction records that have nothing to do auditing taxpayers. If the IRS seeks to deflect the criticism it has received from Congress, the GAO, and the Treasury Department's own TIGTA, it should do so without misusing the John Doe summons process. Whether the summons seeks records from 500,000 or 14,000 account holders, this was and is a fishing expedition. All that has changed is that the IRS has narrowed the size of the "fishing hole."

\*       \*       \*

At the end of the day, what the IRS has is a policy problem. As set forth in both the GAO Report and the TIGTA Report, the solution lies in better policies, including more guidance, rules and regulations, and third-party reporting requirements – and perhaps also more research by the IRS and cooperative outreach to the industry. But it is improper for the IRS to abuse an enforcement tool to engage in an broad fishing expedition into the private financial records of more than 14,000 persons. If a similar John Doe summons were served on a bank, with a similarly flimsy evidentiary record, the Court would not hesitate in denying enforcement. So too, here, enforcement should be denied.

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

**III.** **THE PETITION SHOULD BE DENIED BECAUSE ENFORCEMENT OF THE SUMMONS WOULD BE AN ABUSE OF THE COURT'S PROCESS**

More than fifty years ago, the United States Supreme Court stated, in the context of an IRS summons enforcement petition, that it "is the court's process which is invoked to enforce the … summons and a court may not permit its process to be abused." *Powell*, 379 U.S. at 58. As set forth above, here the Government seeks to enforce a summons that lacks a proper investigative purpose, and that seeks the production of a vast array of documents relating to more than 14,000 accounts, without any proper foundation. That is an abuse of process that justifies denying the enforcement petition. *See Matter of Oil and Gas Producers Having Processing Agreements with Kerr-McGee Corp.*, 500 F. Supp. 440, 443 (W.D. Okla. 1980) (rejecting attempt by IRS "to use the John Doe summons procedure as a discovery device").[7]

**IV.** **COINBASE REQUESTS AN EVIDENTIARY HEARING**

Although Coinbase maintains that this Court should deny the petition outright, in the alternative Coinbase requests an evidentiary hearing. When a petition to enforce a summons is challenged, and the challenger makes a "sufficient showing," the challenger is then "entitled to a limited evidentiary hearing." *Samuels, Kramer & Co.*, 712 F.2d at 1346-47. To make such a showing, the challenger need only introduce "some evidence" that raises "sufficient doubt" about the Government's intentions in the enforcement action. *Church of Scientology*, 520 F.2d at 824-25; *see also United States v. Kis*, 658 F.2d 526, 540 (7th Cir. 1981); *United States v. Microsoft Corp.*, No. 2:15-CV-00102-RSM, 2015 WL 4496749, at *4 (W.D. Wash. June 17, 2015) (finding Microsoft met "its fairly slight burden to trigger an evidentiary hearing").

Here, the IRS initially sought records of *all* users for three years—nearly 500,000 users. The Government has now "narrowed" its requests, providing no evidence to support its contentions and no explanation for why it has done so. Coinbase, as noted above, questions the

---

[7] To the extent that the Court is required to make a finding of good or bad faith, it is important to recognize that this inquiry does not focus on the subjective state of mind of an individual IRS agent. *See LaSalle Nat. Bank*, 437 U.S. at 315-17. Coinbase need not show that anyone associated with the petition is acting out of subjective bad faith or harboring any ill will toward Coinbase or its account holders.

thin evidence that the Government has submitted in support of its petition, including the Second Utzke Declaration, which is summary in nature and, in places, does not establish whether it is based upon personal knowledge. In addition, there is no evidence in the record explaining, much less supporting, why the Government now seeks the information described in the summons from the 14,000 accounts. The evidence in the record indicates: (1) the IRS is not interested in auditing, and does not have the financial resources to audit, more than 14,000 account holders, or any substantial subset thereof; (2) the IRS may be using the summons to conduct general research or otherwise to blunt criticism from Congress, the GAO, and the Treasury Department; and (3) there is no connection between the overbroad summons and any suspicion of wrongdoing. Coinbase should be permitted to proceed with a limited evidentiary hearing to address these issues.

## CONCLUSION

For the foregoing reasons, Coinbase respectfully requests that the Court deny the petition.

Moreover, in the event that the Court grants the petition (in whole or in part), Coinbase respectfully requests that (a) affected account holders be notified that the Court has ordered that their information must be turned over to the IRS and (b) affected account holders be given the opportunity to object before Coinbase provides the information to the IRS.

Respectfully submitted,

Dated: July 27, 2017      By:   /s/  Steven A. Ellis

MICHAEL T. LEMPRES
*mike.lempres@coinbase.com*
JUAN A. SUAREZ
*juan@coinbase.com*
**COINBASE, INC.**

STEVEN A. ELLIS
*sellis@goodwinlaw.com*
GRANT P. FONDO
*gfondo@goodwinlaw.com*
SHAUNA E. WOODS
*swoods@goodwinlaw.com*
**GOODWIN PROCTER LLP**

Attorneys for Respondent COINBASE, INC.

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA 90017

## CERTIFICATE OF SERVICE

*United States of America v. Coinbase, Inc.*
N.D. Cal Case No. 3: 17-cv-01431-JSC

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on **July 27, 2017**.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on **July 27, 2017**.

/s/     Steven A. Ellis
        STEVEN A. ELLIS

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, CA  90017