DAVID A. HUBBERT
Acting Assistant Attorney General

JEREMY N. HENDON (ORBN 982490)
AMY MATCHISON (CABN 217022)
LANDON M. YOST (CABN 267847)
Trial Attorneys
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:    (202) 353-2466
                     (202) 307-6422
Fax:            (202) 307-0054
E-mail: Jeremy.Hendon@usdoj.gov
           Amy.T.Matchison@usdoj.gov
           Landon.M.Yost@usdoj.gov
           Western.Taxcivil@usdoj.gov

BRIAN J. STRETCH (CABN 163973)
United States Attorney
THOMAS MOORE (ALBN 4305-O78T)
Chief, Tax Division
COLIN C. SAMPSON (CABN 249784)
Assistant United States Attorney
450 Golden Gate Avenue, 11th Floor
San Francisco, California 94102
Telephone: (415) 436-7020
Email:  Colin.Sampson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:17-cv-01431-JSC |
| | ) | |
| Petitioner, | ) | **UNITED STATES' RESPONSE TO** |
| | ) | **JOHN DOE 4'S OPPOSITION TO** |
| v. | ) | **PETITION TO ENFORCE** |
| | ) | **INTERNAL REVENUE SERVICE** |
| COINBASE, INC., | ) | **SUMMONS** |
| | ) | |
| Respondent. | ) | Courtroom:   F (15th Floor) |
| | ) | Judge:       Hon. Jacqueline Scott Corley |

## TABLE OF CONTENTS

I.  The Summons is Proper and Its Enforcement is Not an Abuse of the Court's Process ..................... 2

   A.  Intervenor Cannot Challenge the Court's Prior Determination that the John Doe Factors Under § 7609(f) Have Been Met .................................................................................................................. 2

   B.  Even if the Court Determines that Intervenor Has Made a Procedurally Proper Argument, the United States Has Established that the Summons Was Issued for a Legitimate Purpose and Thus There is No Abuse of Process ...................................................................................................... 3

      1.  The history of courts' overwhelming approval and enforcement of John Doe summonses demonstrates the importance of them as a broad investigatory tool that is not limited to situations involving tax avoidance or evasion schemes ............................................................. 3

         a.  From barter exchanges to virtual currency exchanges, perhaps not all that much has changed

         b.  Courts have routinely approved and enforced broad John Doe summonses in other areas not unlike digital currency exchanges ........................................................................................ 5

         c.  Courts' sanctioning of John Doe summonses used in the fight against tax non-compliance through the use of offshore banks reveals not only the importance of this tool, but its broad scope and massive impact ................................................................................................... 6

      2.  Intervenor's two specific contentions are not supported by the facts or law ............................. 9

         a.  The IRS is not engaging in an improper fishing expedition ................................................. 9

         b.  The IRS's supplemental statistical evidence further supports a reasonable concern of a failure to comply with the internal revenue laws .............................................................. 11

II.  Intervenor Has Not Met His Burden Establishing Entitlement to an Evidentiary Hearing ............. 11

   A.  Intervenor's Narrative About the Substance and Timing of the TIGTA Report is False ............ 12

   B.  The Summons Was Not Issued to Further Any Political Agenda ................................................ 13

III.  Intervenor Has Not Met His Burden Establishing an Entitlement to Discovery ............................ 14

IV.  Conclusion .......................................................................................................................... 15

1

# **TABLE OF AUTHORITIES**

2

FEDERAL CASES

3   *In re Tax Liabilities of John Does,* 5:05-mc-00034-NAM-DEP (N.D.N.Y. Mar 7, 2005) ...................... 6

4   *United States v. Samuels, Kramer and Co.*, 712 F.2d 1342 (9th Cir. 1983) ........................... 3, 10, 12, 14

5   *In Matter of Tax Liabilities of Does*, 1984 WL 1109 (D. Mass. Oct. 2, 1984) ............................... 5, 6, 10

6   *In re All Unknown Employees of Boundary Waters Rest. v. United States*, 866 F.2d 1015

7      (8th Cir. 1989) .......................................................................................................... 6

8   *In re Grand Jury Proceedings*, 616 F.3d 1186 (10th Cir. 2010) ........................................... 11

9   *In the Matter of Does*, 1:12-cv-00277 (N.D. Ill. Jan. 18, 2012) ........................................... 6

10  *Matter of Does*, 671 F.2d 977 (6th Cir. 1982) ........................................................... 5, 10

11  *Matter of John Does*, 1990 WL 264130 (D. Nev. Oct. 5, 1990) ........................................... 6

12  *United States v. Armour*, 376 F. Supp. 318 (D. Conn. 1974) ........................................... 10

13  *United States v. Barter Sys., Inc.*, 694 F.2d 163 (8th Cir. 1982) ........................................... 4

14  *United States v. Bisceglia*, 420 U.S. 141 (1975) ........................................................... 8

15  *United States v. Brigham Young University*, 679 F.2d 1345 (10th Cir. 1982) ........................................... 6

16  *United States v. Church of Scientology*, 520 F.2d 818 (9th Cir. 1975) ........................................... 14

17  *United States v. Clarke*, ___ U.S. ___, 134 S.Ct. 2361 (2014) ........................................... 11

18  *United States v. Coble*, No. 82-71-B, 1982 WL 1661 (S.D. Iowa June 2, 1982) ........................................... 5

19  *United States v. Ernst & Whinney*, 750 F.2d 516 (6th Cir. 1984) ........................................... 6

20  *United States v. Humble Oil & Refining Co.*, 488 F.2d 953 (5th Cir.) ........................................... 13

21  *United States v. Island Trade Exch., Inc.*, 535 F. Supp. 993 (E.D.N.Y. 1982) ........................................... 5

22  *United States v. Luther*, 481 F.2d 429 (9th Cir. 1973) ........................................... 11

23  *United States v. Pittsburgh Trade Exch. Inc.*, 644 F.2d 302 (3d Cir. 1981) ........................................... 5

24  *United States v. Powell*, 379 U.S. 48 (1964) ........................................................... 2, 11

25  *United States v. Stuart*, 489 U.S. 353 (1989) ........................................................... 11

26  *United States v. Stuckey*, 646 F.2d 1369 (9th Cir. 1981) ........................................... 14

27

28

FEDERAL STATUTES

26 U.S.C. § 7602 ................................................................................................................. 11

26 U.S.C. § 7609 ...................................................................................................... 3, 4, 9, 11

FEDERAL REGULATIONS

26 C.F.R. § 1.6049-2 ............................................................................................................ 6

OTHER AUTHORITIES

H.R. Rep. 94-658 ................................................................................................................. 5

S. Rep. 94-938 ..................................................................................................................... 5

SECONDARY SOURCES

Lee A. Sheppard, *Busting the Bitcoin Myths*, 142 Tax Notes 896 (Mar. 3, 2014) ..................................... 4

Nicholas Godlove, *Regulatory Overview of Virtual Currency*, 10 Okla. J. L. & Tech. 70 (2014) ............ 4

Robert I. Keller, *The Taxation of Barter Transactions*, 67 Minn. L. Rev. 441 1982-1983 ................... 4, 5

Lacking any actual evidence that the IRS issued the summons to Coinbase for a purpose other than to seek information relevant to an investigation to determine the tax compliance of users of virtual currency, Intervenor John Doe 4 attempts to cast the summons as an intrusion into individuals' personal financial affairs that is so unprecedented in scope and size that the Court can refuse to enforce it even without evidence of an improper purpose. This is wrong as a matter of law, and Intervenor lacks perspective about the use and importance of John Doe summonses.

With respect to scope, John Doe summonses have long been used as a vital tool to assist the IRS in ensuring that all taxpayers, not just those who are already subject to third party reporting requirements, pay their fair share of taxes. Since Congress codified the IRS's power to issue John Doe summonses in 1976, courts have approved the service, and when necessary the enforcement, of hundreds of John Doe summonses in a broad range of situations, including those involving users of barter exchanges, holders of offshore bank accounts, tipped employees, and earners of interest income not required to be reported by third parties. Courts approved all these summonses because the IRS had a reasonable basis for believing that factors in those situations such as the lack of third party reporting indicated the existence of tax non-compliance that the summons would help uncover, which is the correct legal standard. Courts did not require the IRS to prove that there were no legitimate reasons for using a barter exchange or an offshore bank, or that all tipped employees and earners of unreported interest income were underreporting their taxes, which is effectively the standard that Intervenor argues that the IRS must meet in this case.

With respect to size, the IRS has received from other John Doe summonses hundreds of millions of financial records concerning hundreds of thousands of individuals, including detailed records such as account opening records, "know your customer" records, correspondence, and transaction history, and the narrowed summons to Coinbase is not unusual or unprecedented in this respect. Moreover, even this seemingly voluminous information is relatively small when compared to the billions of personal financial records concerning hundreds of millions of taxpayers that the IRS receives every year from parties who, unlike Coinbase, are subject to third party reporting requirements.

Finally, the important effect of these summonses on taxpayers' self-reporting must not be

overlooked. Following the IRS's issuance of previous John Doe summonses that gave the IRS some visibility into areas that had lacked third party reporting, tens of thousands of taxpayers have voluntarily, if belatedly, reported and paid over $10 billion in taxes, penalties, and interest. Intervenor would have the Court remove the IRS's ability to discover past non-compliant taxpayers in the virtual currency space, as well as its ability to foster more self-reporting in this space going forward, all on the basis of a speculative and inaccurate narrative about an improper purpose related to a TIGTA report, and a legally irrelevant and also inaccurate narrative about how this summons is supposedly unprecedented. Intervenor has not produced sufficient evidence of bad faith on the part of the IRS for the Court to conduct an evidentiary hearing, let alone to quash the summons.

## I.   The Summons is Proper and Its Enforcement is Not an Abuse of the Court's Process

### A.   Intervenor Cannot Challenge the Court's Prior Determination that the John Doe Factors Under § 7609(f) Have Been Met

Intervenor provides the proper test this Court should apply to determine whether the summons should be enforced: (1) was the summons issued for a legitimate purpose; (2) does it seek information relevant to that purpose; (3) does it seek information that is not already within the IRS's possession; and (4) does it satisfy all administrative steps required by the United States Code. *See United States v. Powell*, 379 U.S. 48, 57-58 (1964). Guised as a challenge to whether the summons was issued for a legitimate purpose as required by *Powell*, Intervenor's true argument is that the IRS is misusing the John Doe summons process and in turn, abusing the Court's process by seeking enforcement of the summons. In order to make that claim, however, Intervenor is necessarily challenging this Court's previous finding that there is a reasonable basis for believing that U.S. taxpayers who transacted in virtual currency between 2013 through 2015 failed or may have failed to comply with any provision of the internal revenue laws. Specifically, Intervenor complains that the United States has not provided "specific facts concerning a specific situation" justifying issuing a John Doe summons and that the United States has not presented evidence that the unidentified taxpayers whose identities the IRS seeks to obtain have engaged in "a specific type of tax avoidance behavior" or "engaged in conduct that is suggestive of tax liability."  JD Brief at 11:14-12:13. As such, Intervenor is improperly seeking to relitigate this Court's prior determination regarding service of the John Doe summons which it is not allowed to do. *United*

*States v. Samuels, Kramer and Co.*, 712 F.2d 1342, 1346 (9th Cir. 1983). Accordingly, the Court should reject Intervenor's attempt at an end-run around 26 U.S.C. § 7609(f) and this Court's previous ruling.

**B.     Even if the Court Determines that Intervenor Has Made a Procedurally Proper Argument, the United States Has Established that the Summons Was Issued for a Legitimate Purpose and Thus There is No Abuse of Process**

Intervenor's complaint about the IRS's use of the summons here is predicated on a false and unsupported assumption that a John Doe summons can only be issued when the IRS identifies a specific tax avoidance or evasion scheme that it is investigating (for example tax shelters or use of foreign banks to hide money). From that false assumption, Intervenor believes that the IRS cannot possibly be conducting a legitimate investigation because the use of virtual currency is not inherently suspicious or illegal and the IRS has not identified any specific tax avoidance or scheme utilized by taxpayers using virtual currency. Further, Intervenor has contended that the IRS's use of the summons is unprecedented not only in its basis for issuing the summons and to the type of entity, but also in the amount of account holders implicated and responsive documents to be produced. As discussed below, Intervenor is wrong on all accounts. Historically courts have approved, and if necessary enforced, John Doe summonses seeking a broad universe of documents covering thousands of taxpayers based on the same type of evidence submitted in this case. Thus, enforcing a similar summons here is not an abuse of this Court's process. Further, the IRS is conducting an investigation into virtual currency users and the summons to Coinbase is just a part of that investigation. The summons is not the entirety of the investigation. Therefore, the narrowing the summons does not mean that the IRS's investigation has also been narrowed.

**1.     The history of courts' overwhelming approval and enforcement of John Doe summonses demonstrates the importance of them as a broad investigatory tool that is not limited to situations involving tax avoidance or evasion schemes**

**a.     From barter exchanges to virtual currency exchanges, perhaps not all that much has changed**

Not unlike how virtual currencies are beginning to proliferate today, in the "computer age" of the early 1980s a medium of exchange known as "trade units" flourished. *See, e.g., Bartering Clubs Prosper in Computer Age*, N.Y. Times, December 19, 1981. Many people joined barter clubs ran by trade

exchanges where they annually sold hundreds of millions of dollars worth of goods and services in exchange for "trade units," which they could then use to pay the exchange's fees and commissions and to buy goods and services such as dental or accounting work from other members. *Id.*; Robert I. Keller, *The Taxation of Barter Transactions*, 67 Minn. L. Rev. 441, 481-90, 1982-1983. Although there were legitimate reasons to join barter clubs, this cash-less system of exchange posed the same obvious potential for tax non-compliance posed today by virtual currencies, particularly considering that, much like with virtual currency exchanges such as Coinbase, information reporting requirements had not yet been imposed upon the trade exchanges. *See*, *e.g.*, *How Tax Evasion Has Grown*, N.Y. Times, March 15, 1981 (reflecting the then-widespread concern about the potential for tax avoidance from barter activity).

In short, the barter exchanges of yesteryear, like the virtual currency exchanges of today, are vivid examples of those cases that the legislative history to § 7609(f) makes clear Congress was concerned about when it codified the IRS's John Doe summons power: "cases where the facts of a particular case are so suggestive of possible tax liability that the Service could be remiss in its duty of collection and enforcement of the Internal Revenue laws if it did not investigate." [1] H.R. Rep. 94-658, 311; S. Rep. 94-938, 372.  Although barter exchanges are now required to report activity to the IRS, before that requirement existed, those exchanges, like digital currency exchanges today, presented one of those cases in which "the John Doe summons [was] the only practical investigative tool which [was] available." H.R. Rep. 94-658, 311; S. Rep. 94-938, 372 (not referring specifically to barter exchanges).

The IRS therefore began to issue summonses to barter exchanges around the country, including to some of the biggest barter exchanges, such as Barter Systems, Inc. with its roughly 25,000 members nationwide, requesting the names and transactional history of all of these exchanges' members over multi-year periods.[2] Keller, 67 Minn. L. Rev. at 485-88. Some exchanges resisted, and enforcement

---

[1] Interestingly, in the taxation context, observers have remarked on other similarities between bitcoin and the trade units employed by barter exchanges. *See*, *e.g.*, Nicholas Godlove, *Regulatory Overview of Virtual Currency*, 10 Okla. J. L. & Tech. 70 (2014); Lee A. Sheppard, *Busting the Bitcoin Myths*, 142 Tax Notes 896 (Mar. 3, 2014) ("Bitcoin is analogous to the trade units considered in Barter Systems Inc. of Wichita").

[2] *See*, *e.g.*, *United States v. Barter Sys., Inc.*, 694 F.2d 163, 165 (8th Cir. 1982) (requesting all names, account numbers, fee history, and monthly account statements for each of Barter System, Inc.'s roughly 25,000 nationwide members).

1  actions were brought in which the exchanges made arguments similar to Intervenor's arguments

2  regarding lack of a reasonable basis for suspecting tax avoidance and improper research purpose. Those

3  arguments were rejected and eventually all John Doe summonses to barter exchanges were enforced.

4  *United States v. Pittsburgh Trade Exch. Inc.*, 644 F.2d 302, 307 (3d Cir. 1981) (enforced based

5  principally on revenue agent's testimony that trade exchanges were "inherently susceptible to tax error

6  since no cash is involved;" argument that the Congressional concern about barter suggested that the IRS

7  had an improper general research motive that would prevent enforcement rejected); *Matter of Does*, 671

8  F.2d 977, 980 (6th Cir. 1982) (rejecting district court's conclusion that it was a mere "fishing

9  expedition," and holding that it was "clear that Congress did not expect the Service to delay its

10 investigation of suspicious or unusual circumstances until it had evidence of an actual violation; it is

11 enough that the facts surrounding a transaction suggest the probable occurrence of reporting errors");

12 *United States v. Island Trade Exch., Inc.*, 535 F. Supp. 993, 996 (E.D.N.Y. 1982); *United States v.*

13 *Coble*, No. 82-71-B, 1982 WL 1661, at *5 (S.D. Iowa June 2, 1982).

b.  <u>Courts have routinely approved and enforced broad John Doe summonses</u>
<u>in other areas not unlike digital currency exchanges</u>

16     The IRS has made use of broad John Doe summonses in other realms where, like barter

17 exchanges pre-1982 and digital currency exchanges today, there is no third-party reporting of income.

18 For example, prior to 1983, although banks were generally required to report interest income to the IRS,

19 there was an exception for interest earned from CDs issued in amounts of $100,000 or more. 26 C.F.R. §

20 1.6049-2(a)(2); *In Matter of Tax Liabilities of Does*, 1984 WL 1109 (D. Mass. Oct. 2, 1984).

21 Unsurprisingly, voluntary reporting of this interest income was extremely low, as the IRS discovered

22 when it examined a bank in Buffalo, New York, and discovered that "107 individual holders [of such

23 CDs] out of 115 examined had underreported interest income earned." *Id.* at 1. Based on the results of

24 this examination, the IRS obtained approval from a district court to serve a John Doe summons on First

25 National Bank of Boston (FNBB) seeking records concerning the identity of all persons who had

26 received interest income from these CDs. *Id.* FNBB refused to comply, and the court ordered the

27 summons enforced, finding that the summons met the *Powell* criteria because the information requested

28 by the summons was relevant to the legitimate purpose of "attempting to uncover the identities of any

individuals who have failed to properly report income earned during 1980, 1981, or 1982 on certain CDs issued by FNBB." *Id.* at 3. Notably, the court also rejected the argument that the IRS was on a "fishing expedition" because "the legislative history of § 7609(f) indicates that Congress considered the *ex parte* § 7609(f) hearing adequate protection against 'fishing.'" *Id.* at 4.

Another area where the IRS has issued John Doe summonses to address the obvious potential for tax avoidance given the lack of third-party reporting include cases involving income from tips. *See, e.g.*, *In re All Unknown Employees of Boundary Waters Rest. v. United States*, 866 F.2d 1015 (8th Cir. 1989) (upholding a district court's enforcement of a summons requesting information regarding tipped employees as part of an IRS investigation begun after a 1982 Senate Report indicated a low compliance rate in reporting tip income [at 1017]; also noting that "[b]roadness alone is not sufficient justification to refuse enforcement of a subpoena so long as the material sought is relevant" [at 1021-22]); *Matter of John Does*, 1990 WL 264130, at *3-4 (D. Nev. Oct. 5, 1990) (while finding some requests too vague too enforce, the court enforced most of the summons' requests for information about tipped gaming employees broad information about "all directly or indirectly tipped gaming employees" at a casino, rejecting the casino's arguments regarding "fishing" and "research").[3]

        c.     Courts' sanctioning of John Doe summonses used in the fight against tax non-compliance through the use of offshore banks reveals not only the importance of this tool, but its broad scope and massive impact

The John Doe summons has been a vital enforcement tool in the fight against tax non-

---

[3] Other examples of John Doe summonses routinely approved, and if necessary, enforced, by courts include summonses issued to ascertain holders of municipal bonds that had been advertised as tax exempt but that the IRS did not believe were tax exempt, *see e.g. In re Tax Liabilities of John Does,* 5:05-mc-00034-NAM-DEP (N.D.N.Y. Mar 7, 2005) (approving a John Doe summons to Bank of New York Trust Company requesting information about all recipients of income from New Orleans bonds for 2000-2004); John Doe summonses to accounting or law firms requesting the identities of clients participating in certain tax strategies, or even just those clients the IRS suspected might be participating in certain tax strategies based on their subscription to an investment tax credit study, *see, e.g. United States v. Ernst & Whinney*, 750 F.2d 516 (6th Cir. 1984); a John Does summons to a university requesting the names of all donors who for any of the years 1976-1978 made a charitable contribution to the university of any property other than securities, *United States v. Brigham Young University*, 679 F.2d 1345 (10th Cir. 1982); and a John Doe summons requesting all documents and records with respect to any person who leased, subleased, or rented an exchange seat, membership, trading rights, or other interest therein in 2008-2010 with the CME Group (formerly known as the Chicago Mercantile Exchange and Chicago Board of Trade), *In the Matter of Does*, 1:12-cv-00277 (N.D. Ill. Jan. 18, 2012).

compliance through the use of offshore banks. And contrary to Intervenor's suggestion that the summons in this case is somehow uniquely overbroad for requesting data for thousands of account holders, courts have routinely sanctioned the use of much broader John Doe summonses through which the IRS has obtained the records of millions of account holders.

For example, as part of the IRS's Offshore Credit Card Project, the IRS issued a total of 149 John Doe summonses to request information from domestic credit card companies, merchants, and third party credit card processors. Declaration of Cheryl Kiger, ¶ 17. Through the use of these John Doe summonses, the IRS has received information on more than 100 million transactions and identified tens of thousands of taxpayers as non-compliant. *Id.* ¶ 38. One representative summons was to MasterCard, requesting the following information about all holders of MasterCard cards issued by banks in certain jurisdictions in 1998 and 1999: names, addresses, Social Security numbers, account applications, correspondence, credit investigation files, invoices, etc. *Id.* ¶ 18. The IRS received more than 1.7 million transaction records for more than 230,000 unique accounts from this summons alone. *Id.*¶ 38. Based on these records, the IRS developed thousands of cases for civil examinations and criminal investigations. *Id.* Every one of the 149 John Doe summonses issued as part of this Project was approved by a district court. *Id.* ¶¶ 18-21.

Another example involves John Doe summonses issued as part of the IRS's Offshore Private Banking Initiative. Although it is not inherently illegal to utilize offshore private banking, there is also the obvious potential for tax non-compliance, and so the IRS has issued John Doe summonses to offshore banks with United States branches, or, if no such branches exist, to United States banks who serve as correspondent banks for the offshore banks, in order to determine whether their customers have been properly reporting their tax liability. *Id.* ¶¶ 26-34. One representative summons was to UBS AG Switzerland, a Swiss bank with a major presence in the United States. *Id.* ¶ 27. As a result of the summons to UBS, along with a petition to enforce that summons, UBS eventually turned over to the IRS information on approximately 10,000 UBS customers, along with detailed records of account opening records, "know your customer" records, correspondence, transaction history, etc. *Id.* ¶¶ 27, 39. Numerous other such summonses, all approved by a district court, were issued to obtain account

information for customers of foreign banks. *Id.* ¶¶ 28-34. Among other data received from these summonses are millions of records of wire transfer transaction activity. *Id.* ¶ 39. The IRS has been reviewing such data, identifying United States taxpayers, identifying non-compliant taxpayers for examination, and for taxpayers who are already under examination, sending the data to the revenue agent conducting the examination of that taxpayer. *Id.*

Other John Doe summonses approved by district courts include summonses to PayPal requiring it to provide information relating to the identities of the owners of 18,379 payment cards identified through prior John Doe summonses, as well as information on additional United States taxpayers with PayPal accounts associated with a bank account or payment card connected to a bank located in one of 34 offshore jurisdictions; to First Data Corporation requesting information about all customers with an agreement with a Bermuda corporation; and summonses on various entities, including Federal Express, UPS, Western Union, Federal Reserve Bank of New York, Clearing House, and HSBC USA, to obtain information about taxpayers who had used the services of Sovereign Management & Legal, a corporate services provider in Panama. *Id.* ¶¶ 23, 25, 36.

Perhaps an equally important aspect of the IRS's use of these John Doe summonses, a vitally important aspect in the case of digital currencies, is the effect that such summonses have on voluntary compliance. As the Supreme Court recognized in *Bisceglia*, when it sanctioned the IRS's John Doe summons power, "our tax structure is based on a system of self-reporting," and although John Doe summons "investigations unquestionably involve some invasion of privacy, they are essential to our self-reporting system." *United States v. Bisceglia*, 420 U.S. 141, 146 (1975). As a result of the John Doe summons activity in the area of offshore tax avoidance, the IRS has offered and continued its offshore voluntary disclosure programs, offering four in total, the 2003 Offshore Voluntary Compliance Initiative (2003 OVCI), the 2009 Offshore Voluntary Disclosure Program (2009 OVDP), the 2011 Offshore Voluntary Disclosure Initiative (2011 OVDI), and the 2012 Offshore Voluntary Disclosure Program (2012 OVDP). Approximately 1,300 taxpayers disclosed under the 2003 OVCI, admitting to evading taxes on over 3,700 tax returns, and paying over to the Treasury approximately $270 million in tax, penalties, and interest. The 2009 OVDP, 2011 OVDI, 2012 OVDP programs have resulted in more than

55,800 voluntary disclosures from individuals who have paid approximately $9.9 billion in back taxes, interest and penalties. Kiger Decl., ¶¶ 42-43. Additionally, 48,000 taxpayers have taken advantage of the IRS's Streamlined Filing Compliance Procedures, which is an avenue for taxpayers residing both inside and outside the United States to come into compliance. Such submissions resulted in the collection of $450 million in tax. *Id.*

It does not take a cynic to imagine that these taxpayers would not have belatedly self-reported and paid their past taxes without the threat to them posed by the John Doe summonses. Similarly, it does not take a pessimist to imagine that the self reporting of gains from digital currency holders will remain abysmally low should the Court refuse to enforce this summons.

Contrary to Intervenor's unsupported arguments about what it believes the scope and purpose of a John Doe summons should be, these cases demonstrate that the IRS's use of the summons to Coinbase is in line with what courts have found to be the proper purpose and use of a John Doe summons. Similar to those cases, the IRS has identified a potential problem with compliance with the internal revenue laws without the need to point to or otherwise rely on an existing tax avoidance scheme. Unlike the overbroad example of the IRS issuing a John Doe summons to a bank to obtain all records of every accountholder, the IRS's current investigation regarding virtual currency transactions (and the barter, tips, and CD interest cases discussed above) involve situations where there is no third-party reporting requirement and reason exists to believe that compliance with the internal revenue laws may be lacking.

### 2. Intervenor's two specific contentions are not supported by the facts or law

In addition to his general complaint that the summons is unprecedented and not applicable in this type of situation, Intervenor sets forth two specific arguments which are not supported by facts or the law: (1) that the IRS is simply engaging in an improper fishing expedition and (2) the statistical evidence about non-compliance submitted with the petition to enforce summons does not establish a tax liability problem or concern. Neither argument refutes the legitimate investigation being conducted by the IRS or shows that the IRS is acting in bad faith.

#### a.   The IRS is not engaging in an improper fishing expedition

Although the Ninth Circuit recognized that Congress enacted § 7609(f) and (h) "mainly 'to

preclude the IRS from using such summonses to engage in possible 'fishing expeditions,'" it noted that the "procedural safeguard," or "prior restraint," for the exercise of this power is the requirement that the IRS apply "ex parte for authorization to issue such summonses."  *Samuels, Kramer & Co.*, 712 F.2d at 1346 (internal citations omitted). Once a court has approved the service of the summons, the summoned party cannot contest the enforcement of the summons on the grounds that it constitutes a fishing expedition with no reasonable basis, but must instead refute the government's prima facie *Powell* case of a "good-faith pursuit" of a tax enforcement purpose by introducing "some *evidence*" of "bad faith." *Id.* at 1344-47 (emphasis in original; internal citations omitted). Thus, because this Court already found at the *ex parte* stage that the IRS had a reasonable basis for believing that some of Coinbase's users may have failed to comply with the tax laws, Intervenor cannot contest this issue under the guise of challenging the government's prima facie *Powell* showing.

But putting the procedural posture of this case aside, even if Intervenor could challenge enforcement of the summons on the grounds that it is a fishing expedition, he misunderstands the nature of the fishing expedition that Congress was concerned about when it created the *ex parte* procedure for John Doe summonses. Investigations of John Doe taxpayers, by their very nature, involve some fishing: the IRS, based on information developed through institutional experience, internal data, other examinations, or the public record, develops a reasonable basis for believing that a certain fishing hole contains non-compliant taxpayers, and so it casts its summons into that hole to catch them. Congress has specifically licensed the IRS to fish in this manner. *See*, *e.g.*, *United States v. Armour*, 376 F. Supp. 318, 327 (D. Conn. 1974) (noting that the "familiar anguish about 'fishing expeditions' has been met in this context with the observation that the Secretary or his delegate has been specifically licensed to fish by § 7602") (internal quotations omitted); *In Matter of Tax Liabilities of Does*, M.B.D. No. 84-133, 1984 WL 1109 (D. Mass. Oct. 2, 1984) ("the legislative history of § 7609(f) indicates that Congress considered an *ex parte* § 7609(f) hearing adequate protection against 'fishing'" and therefore prohibiting such argument in the enforcement proceeding). The language in the legislative history about fishing expeditions "indicates only an intent to prevent the Service from exercising its summons power in an arbitrary or quixotic manner." *Matter of Does*, 671 F.2d 977, 980-81 (6th Cir. 1982); *cf. In re Grand*

1  *Jury Proceedings*, <u>616 F.3d 1186</u>, 1203 (10th Cir. 2010) (noting that with respect to a grand jury

2  investigation, which also "necessarily involves a fishing expedition," "such fishing is permissible so

3  long as it is not an *arbitrary* fishing expedition" (emphasis in original). As discussed, there is nothing

4  arbitrary or quixotic about the IRS's basis for believing that not all holders of virtual currency are

5  properly reporting their taxes, and it is therefore not engaged in an impermissible fishing expedition.

6  Further, Congress has allowed the IRS to fish in § 7602. *See United States v. Luther*, <u>481 F.2d 429</u>, 432

7  (9th Cir. 1973) ("The answer to the claim that the Government is engaged in a fishing expedition is

8  without merit. Sec. 7602 authorizes the Secretary or his delegate "to fish").

9               b.   <u>The IRS's supplemental statistical evidence further supports a reasonable</u>
                    <u>concern of a failure to comply with the internal revenue laws</u>

10

11  With respect to the IRS's searches of electronically filed income tax returns, Intervenor

12  complains that "the statistics pale in comparison to the specific types of suspicious activity that the

13  Government has previously used to justify John Doe summonses . . . ." JD Brief at 13.[4] This complaint

14  pertains to the evidence necessary for service of the John Doe summons under § 7609(f) and not to any

15  bad faith on the part of the IRS. Therefore, the Court should not consider it.

16  In any event, contrary to Intervenor's assertion, the IRS's investigation has at all times been

17  legitimate. The United States included the statistical information with its petition to enforce the

18  summons as additional evidence of the suspected reporting gap between the number of taxpayers who

19  engage in virtual currency transactions and those who report those transactions on their tax returns. It

20  was not submitted as an after-the-fact attempt to justify anything.

21  **II.   <u>Intervenor Has Not Met His Burden Establishing Entitlement to an Evidentiary Hearing</u>**

22  "[S]ummons enforcement proceedings are to be 'summary in nature.'" *United States v. Clarke*,

23  ___ U.S. ___, <u>134 S.Ct. 2361</u>, 2367 (2014) (*quoting United States v. Stuart*, <u>489 U.S. 353</u>, 369 (1989)).

24  "[C]ourts may ask only whether the IRS issued a summons in good faith, and must eschew any broader

25  role of 'oversee[ing] the [IRS's] determinations to investigate." *Id.* (*quoting Powell*, 379 U.S. at 56).

26  Accordingly, an evidentiary hearing is not automatically or normally held.

27  ⁴ Intervenor claims this "Court has already stated that these statistics cannot justify the
enforcement of a wide-ranging John Doe summons." JD Brief at 13. This Court has not made such a

28  ruling.

Instead, a party who seeks an evidentiary hearing must show "specific facts or circumstances plausibly raising an inference of bad faith" or improper motive. *Id*. at 2367-68. "Naked allegations of improper purpose are not enough . . . [the party] must offer some credible evidence supporting his charge." *Id*. at 2368. "That standard will ensure inquiry where the facts and circumstances make inquiry appropriate, without turning every summons dispute into a fishing expedition for official wrongdoing." *Id*. As the Ninth Circuit has stated the taxpayer carries a heavy burden and "must thus allege facts 'from which a court might infer a possibility of some wrongful conduct by the Government.'" *Samuels*, 712 F.2d at 1348 (internal citations omitted).

In *Samuels*, the specific facts supporting an evidentiary hearing were statements by IRS employees made to customers of the summoned entity that the entity was engaged in arranging sham transactions and that the IRS sought to enforce its summons in order to close the entity. *Id*. at 1347. In contrast to this specific type of evidence, Intervenor raises three speculative contentions (not facts) in support of his request for a limited evidentiary hearing, none of which are persuasive. Because all three of Intervenor's contentions are based on rank speculation and conjecture, rather than specific facts or actual evidence, the Court should deny Intervenor's request for an evidentiary hearing.

### A. Intervenor's Narrative About the Substance and Timing of the TIGTA Report is False

Intervenor first improperly attempts to use the September 2016 TIGTA Report regarding virtual currencies as a basis to show bad faith in order to obtain an evidentiary hearing. Intervenor grossly misreads the Report to speculate that "the IRS is not in a position to enforce compliance with the tax code with respect to virtual currency." JD Brief at 15. There is nothing in the Report that remotely hints that the IRS is not able to enforce compliance with the tax laws with respect to virtual currency. The IRS is well aware of the tax issues surrounding virtual currency use and is ready and able to review the records requested in the summons. (Kiger Decl., ¶ 14). Further, the IRS has not admitted that its guidance regarding virtual currency is insufficient, but instead only "agreed that additional guidance would be helpful." Report, p. 11. Nothing in the Report provides any evidence, or even inference, that there might be some wrongful conduct by the IRS with respect to the summons.

Intervenor suggests that the timing of the petition to serve the summons implies that the

summons was improperly issued for research purposes in response to the Report.  JD Brief at 16.[5]  This

speculation is not supported by the facts. In June 2014 the IRS internally approved Coinbase as a

potential target of a John Doe summons. (Kiger Decl., ¶ 8). It was not until two years later, in September

2016, that TIGTA issued its Report. Thus, the summons could not possibly have been issued to respond

to the Report. Intervenor has not provided any facts to refute the sworn statement of Senior Revenue

Agent David Utzke that the summons was issued as part of an investigation to determine the identities

and income tax liabilities of virtual currency users for the three years at issue. That is undisputedly a

valid purpose under § 7602.

Intervenor next mischaracterizes the discussion regarding TIGTA's third recommendation in the

Report by saying that the IRS does not dispute that it does not have a method for gathering the necessary

data to analyze the risk and scope of non-compliance with the Internal Revenue Code. JD Brief at 16.

TIGTA's recommendation concerned third-party reporting information to be provided to the IRS and the

IRS agreed that such information should be revised to identify amounts of virtual currency used in

taxable transactions. The IRS stated that it would consider such changes as part of its overall strategy

development regarding virtual currency. Contrary to Intervenor's mischaracterization, TIGTA's further

responsive comment related to third party reporting only and not that the IRS had no method in place to

evaluate virtual currency information as a whole.

Intervenor's speculation does not stop there. Intervenor next contends that the IRS's statement

that the requested information is needed as part of its investigation to identify and determine the correct

federal income tax liability of U.S. persons engaging in virtual currency transactions is "undoubtedly" a

pretext because of the IRS's current resource constraints. JD Brief at 16. In other words, Intervenor is

arguing that because the IRS cannot possibly identify and examine *all* non-compliant taxpayers that the

Court should not allow the IRS to identify and examine *any* non-compliant taxpayers. This absurd

argument is not a basis for the Court to refuse to enforce the summons.

**B.     The Summons Was Not Issued to Further Any Political Agenda**

Intervenor's third basis for seeking an evidentiary hearing is completely far-fetched and is not

---

[5] Intervenor's reliance on *United States v. Humble Oil & Refining Co.*, 488 F.2d 953 (5th Cir.) is entirely misplaced for the reasons discussed in the Response to Coinbase.

1   supported by any evidence or facts. Intervenor contends that the government is pursuing the summons to

2   harass taxpayers who use virtual currency or to further some sort of a political agenda against virtual

3   currency use. Intervenor's out of context quotations of Jamie Dimon (not a government official) and a

4   single U.S. Senator are not evidence in support of his anti-virtual currency conspiracy theory. Moreover,

5   Senator Manchin's full comments, in the very article cited by Intervenor, reveal that the Senator was not

6   hostile to virtual currency entirely, but was concerned with the government's ability to respond to the

7   unstable nature of virtual currency and to protect Americans from potential financial harm. These out of

8   context statements by non-IRS employees are not specific facts that raise doubts about the IRS's good

9   faith and do not support granting Intervenor an evidentiary hearing.

10   **III.   Intervenor Has Not Met His Burden Establishing an Entitlement to Discovery**

11       Discovery in a summons enforcement proceeding is the exception rather than the rule. *United*

12   *States v. Stuckey*, 646 F.2d 1369, 1374 (9th Cir. 1981). The Ninth Circuit permits "limited discovery

13   only if the [requesting party] can make a substantial preliminary showing of abuse or wrongdoing." *Id.*

14   (quoting *United States v. Church of Scientology*, 520 F.2d 818, 824 (9th Cir. 1975)). *If* an evidentiary

15   hearing is held, *then* the court may decide if discovery is warranted. *Stuckey*, 646 F.2d at 1374.

16       Although Intervenor acknowledges that it is not proper to consider requests for discovery in a

17   summons enforcement proceeding until after the Court were to hold a limited evidentiary hearing, he

18   still insists that the Court should order discovery now. The Court should reject Intervenor's invitation to

19   diverge from binding precedent and grant his request for pre-hearing discovery.

20       Notwithstanding the inappropriateness of Intervenor's request, Intervenor has not demonstrated

21   that even if an evidentiary hearing is granted and held, there would still be questions as to the IRS's

22   good faith necessary to support a finding that discovery is warranted. Intervenor asserts that Utzke's

23   declaration does not describe sufficient details of the IRS's investigation and that a limited evidentiary

24   hearing confined to that information "will not provide the Court with significant evidence."  JD Brief at

25   18. Contrary to Intervenor's statement, the IRS agent's declaration is all that is normally required to

26   meet the *Powell* factors, including establishing the existence of a legitimate investigation.  *See Samuels*,

27   712 F.2d at 1345. Intervenor next contends that the United States has not provided any evidentiary basis

28

for the statistical evidence submitted with its petition to enforce. Concurrently filed with this response is a third declaration from Utzke that provides further explanation regarding the searches. Even without this additional declaration, the information regarding the searches in no way relates to the IRS's good faith. This Court has already found that the United States has established that there is a reasonable basis to believe that U.S. taxpayers engaging in virtual currency transactions have or may have failed to comply with the tax laws. The statistical evidence is simply supplemental evidence to support the Court's prior ruling that there is a reasonable basis to believe that U.S. persons who conducted transactions in virtual currency may have failed to report income to the IRS.

**IV.** **Conclusion**

For the foregoing reasons, the United States' Petition to Enforce Internal Revenue Service Summons should be granted and the summons requests, as narrowed, should be enforced.

Dated this 1st day of September, 2017.

DAVID A. HUBBERT
Acting Assistant Attorney General

*/s/ Jeremy N. Hendon*
*/s/ Amy Matchison*
*/s/ Landon M. Yost*
JEREMY N. HENDON
AMY MATCHISON
LANDON M. YOST
Trial Attorneys, Tax Division
U.S. Department of Justice

BRIAN J. STRETCH
United States Attorney
Northern District of California

*/s/ Colin C. Sampson*
COLIN C. SAMPSON
Assistant United States Attorney, Tax Division

*Attorneys for United States of America*

1

## **<u>CERTIFICATE OF SERVICE</u>**

2          IT IS HEREBY CERTIFIED that service of the foregoing has been made this 1st day of

3  September, 2017, via the Court's ECF system to all users.

4

5                                          */s/ Amy Matchison*
                                           AMY MATCHISON
6                                          Trial Attorney, Tax Division
                                           U.S. Department of Justice

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28